**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| JOYCE PETTYE, | ) | |
| | ) | |
| Plaintiff, | ) | **Case Number: 1:15-cv-7669** |
| | ) | |
| v. | ) | |
| | ) | **Judge: Hon. Amy J. St. Eve** |
| SANTANDER CONSUMER USA, INC., | ) | |
| an Illinois corporation, | ) | |
| | ) | **Magistrate: Hon. Maria Valdez** |
| Defendant. | ) | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiff, JOYCE PETTYE, ("Plaintiff"), by and through her attorneys, complains

against Defendant, SANTANDER CONSUMER FINANCE, USA, ("Santander"), as

follows:

**INTRODUCTION**

1.      In this action, Plaintiff seeks redress, individually and on behalf of a class,

under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*. ("ECOA"), the Truth in

Lending Act, 15 U.S.C. § 1601 *et seq*. ("TILA"), and the Illinois Motor Vehicle Retail

Installment Sales Act, 815 ILCS 375/1, *et seq*., ("IMVRISA"), for discrimination on the

basis of Plaintiff's identity as a black woman, and the improper collection and disclosure

of finance charges by not including charges for a "GAP" debt-cancellation agreement in

the finance charge with respect to installment notes with an APR in excess of the GAP

program's limits (in Plaintiff's case, a program limit of 24%).

## JURISDICTION AND VENUE

2.      This Court has jurisdiction under 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, namely, the TILA, 15 U.S.C. § 1640(e), and the ECOA, 15 U.S.C. § 1691 *et seq*. Supplemental jurisdiction exists over the state-law claims.

3.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1) & (2) because Santander is subject to personal jurisdiction in this district and thus resides in the district (*see* 28 U.S.C. § 1391(c)(2)), and because a substantial part of the events giving rise to this action occurred in this judicial district.

## PARTIES

4.      Plaintiff, Joyce Pettye, is a black woman domiciled in Chicago, Illinois.

5.      Defendant, Santander, is an Illinois corporation with its principal place of business located at 1601 Elm Street, Suite 800, Dallas, Texas.

## COMMON ALLEGATIONS OF FACT

6.      Defendant Santander engages in the business of financing subprime automobile retail installment contracts, and is therefore defined as an "Indirect Auto Lender" according to the Consumer Financial Protection Bureau (the "CFPB").

7.      On March 21, 2013, the CFPB released a bulletin providing guidance on Indirect Auto Lending and compliance with the ECOA.

8.      The CFPB guidance describes Indirect Auto Lending as financing by a third party such as a depository institution, a nonbank affiliate of a depository institution, an independent nonbank, or a "captive" nonbank (an auto lender whose primary business is to finance the purchase of a specific manufacturer's automobiles).

9.      In indirect auto financing, the dealer usually collects basic information regarding the applicant and uses an automated system to forward that information to several prospective indirect auto lenders.

10.     After evaluating the applicant, indirect auto lenders either choose not to become involved in the transaction, or they choose to provide the dealer with a risk-based "buy rate" that establishes a minimum interest rate at which the lender is willing to purchase the retail installment sales contract executed by the consumer for the purchase of the automobile.

11.     Unbeknownst to consumers, the dealer can then add a percentage to the buy rate – a "markup" - and keep some or all of the difference as compensation. This kickback is typically referred to as a "reserve."

12.     The Center for Responsible Lending ("CRL") estimates that consumers who took out car loans in 2009 will pay $25.8 billion in additional interest over the lives of their loans due to these markups.

13.     The indirect auto lender exercises discretion in adjusting the buy rate, making underwriting exceptions, or modifying other terms and conditions of the financing as a result of additional negotiation between the indirect auto lender and the dealer.

14.     These negotiations are conducted as between the interests of the Lenders and the Dealers, and do not take into account the interests of the borrowers.

15.     Meanwhile, at the encouragement of the lenders such as Santander, auto dealers hold themselves out to consumers and prospective borrowers as agents of those prospective borrowers.

16.     For instance, car dealers, including those for whom Santander provides financing, advertise that they will negotiate with financing companies such as Santander on behalf of the borrower.

17.     These representations are fraudulent. Dealers do not negotiate as agents of the borrowers, but rather participate with lenders to charge discriminatory interest rates on behalf of those lenders.

18.     Dealers are therefore not agents of the borrowers, despite representing that they are.

19.     In the event that the dealer charges the consumer an interest rate that is higher than the lender's buy rate, the lender pays the dealer what is typically referred to as "reserve" (or "participation"), compensation based upon the difference in interest revenues between the buy rate and the actual note rate charged to the consumer in the retail installment contract executed with the dealer.

20.     After the deal is consummated with the consumer, the retail installment contract is then sold to the lender, which has already indicated its willingness to extend credit to the applicant.

21.     Empirical data demonstrates that the practices described above result in a disparate impact on black women, wherein, due to the structural discrimination caused by the lenders' conduct, black women pay far high interest rates and are saddled with more add-on charges than any other group, including white men.

22.     These discriminatory finance agreements have a particularly pronounced impact on the financial health of black families and communities, and are believed to be one driver of persisting economic inequality in minority communities.

4

23.     The CFPB has stated that "because of the incentives these policies create, and the discretion they permit, there is a significant risk that they will result in pricing disparities on the basis of race, national origin, and potentially other prohibited bases."

24.     Black women use indirect auto financing, and attempt to negotiate their interest rates, at frequencies in line with the general population.

25.     Yet, as a 2014 study found, in spite of attempting to negotiate pricing more than their white counterparts, people of color received higher interest rates on loans financed through dealers. Thirty-nine percent of Latinos and 32% of African Americans report negotiating their interest rate, compared to only 22% of white car buyers—yet people of color received worse pricing.[1]

26.     In fact, that study found that that people of color received higher interest rates compared to white buyers who did not attempt to negotiate at all.

27.     Furthermore, more borrowers of color report receiving misleading information about their loans from car dealers.

28.     Furthermore, African-Americans are nearly twice as likely to be sold multiple add-on products, such as so-called "GAP protection," as white consumers.

29.     Dealer compensation via "reserves", with the ability to mark up interest rates, creates an incentive for a dealer's staff to discourage the consumer's ability to negotiate well.

---

[1] Davis, Delvin (January 2014) Non-Negotiable: Negotiation Doesn't Help African Americans and Latinos on Dealer-Financed Car Loans. Center for Responsible Lending.

30.     Staff in a dealer's finance and insurance (F&I) office, where financing is finalized and add-on products are sold, provide misleading information that discourages negotiation and comparison shopping.

31.     For example, dealer representatives often tell consumers that they may be unable to obtain financing without the dealer's assistance. In this case, if consumers trust their dealer representative, they may forego any rate negotiation or not be able to negotiate effectively.

32.     Likewise, a dealer representative may falsely assert that certain add-on products are mandatory in order for the loan to be approved. This puts pressure on the consumer to accept add-on purchases without argument.

33.     These problems are compounded for consumers with credit scores that are considered subprime, since there are far fewer options for those consumers outside of dealer financing. Thus, subprime consumers often accept whatever deal is offered because they are not confident that other choices exist for them.

34.     Dr. Mark Cohen of Vanderbilt University reported in a loan-level analysis of five major subprime auto finance companies that 54.6% of African-Americans received an interest rate markup, compared to 30.6% of whites.

35.     Moreover, Cohen reported that African Americans on average paid over twice the amount of rate markup ($742) compared with the average markup paid by whites ($315).

36.     Recently, the CFPB announced findings from their review of data acquired from several large financial institutions that purchase car loans from dealers.

6

37.     CFPB found rate disparities where African Americans, Latinos and Asian Americans paid rates of 10 to 30 basis points (0.10% to 0.30% percentage points) higher than whites with similar credit backgrounds.

38.     For instance, on a typical new car loan of $26,500 with a 4.5% interest rate and loan term of 60 months, a 30 basis point increase would result in an additional $216 for a minority consumer.

39.     Cumulatively over the course of many purchases within a minority group, this amount can have a negative impact on minority communities as a whole.

40.     Using data from the Survey of Consumer Finances, researchers Charles, Hurst, and Stephens (2008) found that for car loans with higher interest rates (at the 75th percentile), African Americans paid 168 basis points more than whites with similar credit profiles financing through a finance company.

41.     Thus, blacks are much more likely than whites to pay very high interest rates, and much less likely to pay rates that are very low.

42.     According to Cohen, racial minorities receive differential treatment from finance companies. That is, blacks appear to pay higher premiums to use these institutions than whites.

43.     Evidence suggests that dealers have considerable market power in handling auto loans for auto purchasers.

44.     For instance, one study found that nearly 80% of all auto financing is done on site at a dealer.

45.     Panel A of the table below reports the results of a study published in the American Economic Review. In the sample, the study found no statistically significant

racial difference in original loan amounts or the length of the loan. The loans to black and white vehicle purchases differ, however, on every other dimension. In particular, blacks are less likely than whites to have purchased a new vehicle, and are dramatically more likely to have obtained a vehicle finance company loan. The table also indicates that the interest rates paid by blacks are, on average, a full 100 basis points higher: 10.6 percent versus 9.6 percent. Consistent with the similarities in loan amount and length and different interest rates, blacks have higher monthly vehicle loan payments[2]:

TABLE 1—VEHICLE LOAN, DEMOGRAPHIC, AND FINANCIAL CHARACTERISTICS BY RACE

| Variable | I<br>All<br>households | II<br>White<br>households | III<br>Black<br>households | IV<br>Difference | V<br>$p$-value of<br>difference |
|---|---|---|---|---|---|
| *A. Vehicle loan characteristics* | | | | | |
| Interest rate | 9.69 | 9.57 | 10.60 | 1.03 | <0.01 |
| Monthly payment | 369 | 366 | 389 | 23 | 0.01 |
| Loan length (months) | 50.4 | 50.5 | 49.5 | −1.0 | 0.18 |
| Original loan amount | 15,310 | 15,240 | 15,860 | 630 | 0.18 |
| New vehicle | 0.52 | 0.53 | 0.46 | −0.06 | 0.04 |
| Finance company loan | 0.36 | 0.34 | 0.51 | 0.17 | <0.01 |
| *B. Demographic characteristics* | | | | | |
| Male | 0.82 | 0.84 | 0.64 | −0.21 | <0.01 |
| Age | 42.6 | 42.7 | 41.8 | −0.9 | 0.30 |
| Household income | 82,700 | 85,410 | 62,630 | −22,770 | <0.01 |
| *C. Financial measures* | | | | | |
| Turned down for loan<br>in past five years | 0.26 | 0.24 | 0.39 | 0.14 | <0.01 |
| Turned down for car loan<br>in past five years | 0.08 | 0.08 | 0.09 | 0.00 | 0.88 |
| Ever late paying bills | 0.17 | 0.15 | 0.29 | 0.13 | <0.01 |
| Ever more than two months late<br>when paying a bill | 0.07 | 0.06 | 0.12 | 0.05 | 0.01 |
| Ever bankrupt | 0.07 | 0.07 | 0.11 | 0.05 | 0.02 |
| Has a savings account | 0.60 | 0.60 | 0.57 | −0.03 | 0.33 |
| Has a checking account | 0.91 | 0.92 | 0.83 | −0.08 | <0.01 |
| Owns a home | 0.58 | 0.60 | 0.45 | −0.15 | <0.01 |
| Holds revolving credit card debt | 0.66 | 0.66 | 0.70 | 0.04 | 0.15 |
| *N* | 3,045 | 2,725 | 320 | | |

[2] Charles, Kerwin Koff, Hurst, Erik, Stephens, Mevin Jr. (2008) Rates for Vehicle Loans: Race and Loan Source IN *American Economic Review: Papers & Proceedings 2008*, 98:2, 315–320 http://www.aeaweb.org/articles.php?doi= 10.1257/aer.98.2.315.

46.     In contrast, the rates African Americans paid on car loans originated directly by a bank or credit union did not have a statistically significant difference from whites.

47.     Moreover, this effect is even more pronounced when considering the experience of black women in particular (as opposed to simply grouping black women with all blacks, or with all women).

48.     This is because the intersection of race and gender implicates more severe manifestations of structural prejudice than those arising from prejudice against blacks, alone, or women, alone.

49.     Scholars argue that race and gender are socially constructed, not only influencing individual identities but also providing principles of organization in the social system.[3] Further, these categories are mutually constituted to produce and maintain social hierarchy.

50.     Collins[4] refers to the "interlocking systems of race, class, and gender" as constituting a "matrix of domination." Within this matrix, an individual can simultaneously experience disadvantage and privilege through the combined statuses of gender, race, and class.

---

[3]     Glenn E.N. (1999). The social construction and institutionalization of gender and race: an integrative framework. In *Revisioning Gender* ed/ M. Marx Feree, J. Lorber, B.B. Hess, (pp. 3-43.). Thousand Oaks. CA: Sage.

[4]     Collins, P.H. (1999). Moving beyond gender: intersectionality and scientific knowledge. . In *Revisioning Gender* ed/ M. Marx Feree, J. Lorber, B.B. Hess, (pp. 3-43.). Thousand Oaks. CA: Sage.

9

51.     Baca Zinn and Thornton Dill[5] note, "[r]ace, class, gender, and sexuality are not reducible to individual attributes to be measured and assessed for their separate contributions in explaining given social outcomes" (p. 329).

52.     Sociologists argue that race is "gendered" and gender is "racialized," so that race and gender fuse to create unique experiences (and opportunities) for all groups – not just women of color.[6]

53.     Indeed, the beliefs and practices associated with gender are inextricably interwoven with the beliefs and practices associated with race.[7]

54.     As a result, theories of racial inequality that fail to incorporate gender into their frameworks are insufficient for understanding the lives of woman of color.[8]

55.     This intersectional experience is one of more severe discrimination than that experienced by blacks or women when those attributes are considered separately.

---

[5]     Baca Zinn, M., & Thornton, Dill B. 91996). Theorizing difference from multiracial feminism. *Fem. Studies*, 22, pp. 321-33.

[6]     Amott, T., Matthaei, J. (1991). Race, class, gender, and women's works: a conceptual framework. IN *Race, Gender, and Work: A Multicultural Economic History of Women in the United States* (ed. T. Arnott & J. Matthaei, pp. 11-30) Boston, MA: South End Press; Essed, P/ (1991). *Understanding Everyday Racism: An interdisciplinary theory*. Newbury Park, CA: Sage; Glenn E.N. (1999). The social construction and institutionalization of race: an integrative framework. In *Revisioning Gender* (ed. M. Marx Feree, J. Lorber; B.B. Hess, pp. 3-43) Thousand Oaks, CA: Sage. Higginbotham E. 1997. Introduction. See Higginbotham& Romero 1997, pp. xv- xxxiii; Landrine H. 1985. Race X class stereotypes of women. *Sex Roles* 13:65–75.

[7]     Ferdman B. 1999. The color and culture of gender in organizations: attending to race and ethnicity. In The Handbook of Gender and Work, ed. G Powell, pp. 17–36. Thousand Oaks, CA: Sage.

[8]     Reskin BF, Charles CZ. 1999. Nowyou see 'em, now you don't: race, ethnicity and gender in labor market research. In Browne I, ed. 1999. Latinas and African American Women at Work: Race, Gender and Economic Inequality. New York: Russell Sage Found., pp. 380–407.

The Table included below (from Ayres) demonstrates the extent to which black women, in particular, obtain the worst consumer outcomes in the indirect automobile financing industry.[9]

832 *HARVARD LAW REVIEW* [Vol. 104:817

| TABLE 2: AVERAGE DEALER PROFIT FOR INITIAL OFFERS | |
|---|---|
| White Male | $ 818 |
| White Female | 829 |
| Black Male | 1534 |
| Black Female | 2169 |

56.     The Table also demonstrates the extent to which black women, in particular, obtain the worst consumer outcomes in the indirect automobile-financing industry.

57.     The fact that African Americans are just as likely to attempt to negotiate their interest rates, while research is finding a disparate impact on blacks, and black women in particular, in rate pricing, indicates that a distortion exists in this market and that the distortion is not due to a failure of consumers to seek the best rate available to them.

58.     People of color are more likely to have their dealer indicate they were getting the "best rate available."

59.     Additionally, people of color are more likely to be told that optional add-on purchases were mandatory.

_____

[9] See Ayers, Ian. Fair Driving: Gender and Race Discrimination in Retail Car Negotiations, HARV. L. REV. 817 (1991)

60.    People of color are also more likely to be unaware of dealer interest rate markups:

61.    The likelihood of being unaware of interest rate markups is greater for African Americans (74.2%) than for whites (65.6%).

62.    Consumers who are not aware of dealer interest rate markups pay higher average interest rates of 1.64 percentage points.

63.    Also, consumers told that add-ons were mandatory purchases averaged more add-on purchases (1.38 purchases) compared to those that were not told that information (0.79 purchases).

64.    The empirical evidence demonstrating that blacks, and in particular black women, are discriminated against in the indirect auto financing industry, has been reported frequently in popular media, both on its own and in connection with the 2013 CFPB guidance. For instance, 2012 Pulitzer Prize nominee Jessica Silver-Greenberg wrote about the matter in a front-page exposé in the December 26, 2014 edition of the *New York Times*. See Silver-Greenberg, Jessica, Corkery, Michael. "Surge in Loans Linked to Cars is Hurting Poor." *The New York Times*. December 26, 2014.

65.    The Wall Street Journal later reported, on August 15, 2015, that Santander has disclosed in a regulatory filing that it is under investigation by the CFPB for overcharging "protected groups" of consumers on auto loans made through car dealerships.

66.    The extensive reporting on the issue has placed Santander on reasonable notice of its and its dealers' discriminatory conduct.

12

67. Moreover, the CFPB regulatory notice also place Santander on notice that its practices are suspect.

68. Indeed, on information and belief, car dealers who originate auto finance deals for Santander market specifically towards members of the vulnerable protected class of black women – particularly black women with poor credit.

## INDIVIDUAL ALLEGATIONS OF FACT

69. On March 5, 2015, Plaintiff went to Al Piemonte Super Car Outlet, a car dealership located in Northlake, Illinois, for the purpose of purchasing a vehicle for her personal use.

70. After conferring with members of the sales staff at the dealership, Plaintiff decided to purchase a used 2012 Ford Focus a price of $13,000.00.

71. In conjunction with this purchase, Plaintiff executed a Retail Installment Contract ("RIC"). A copy of which was originally attached as Exhibit A to Plaintiff's initial complaint; a more legible copy of which was subsequently produced by Santander's counsel and is incorporated herein by reference.

72. Santander is the holder of the RIC.

73. Santander has received payments toward the vehicle that is the subject of the RIC.

74. Santander has collected finance charges pursuant to the RIC.

75. Under the terms of the RIC, Plaintiff is required to make 72 monthly payments of $385.90 at an annual percentage rate of 27.06%.

76. The "Amount Financed" disclosed on the RIC is $13,537.00.

13

77. The "Amount Financed" included the cash purchase price of the vehicle, and other charges.

78. The "Finance Charge" disclosed on the RIC is $14,247.00.

79. The "Total Sale Price," including cost of credit, was disclosed on the RIC as $29,784.80.

80. Before consummation of the credit transaction, Plaintiff was not delivered a copy of the required TILA disclosures in a form she could keep.

81. Before being presented with the RIC to sign, Plaintiff was not given any information regarding the "GAP" debt-cancellation addendum, and specifically the amount charged.

82. In fact, Plaintiff was provided very little information at all about the indirect financing arrangement for which Santander was in the process of qualifying her.

83. After soliciting a "credit application" from Plaintiff, the dealer's sales agents simply represented that they would attempt to obtain financing on behalf of Plaintiff that she would not have been able to obtain without her assistance.

84. After learning that Plaintiff had cash to put down on a vehicle, the dealership's representative, a white male, stated "[w]e are going to try to get you approved – we can do that," or words to that effect.

85. Indeed, at one point, the dealer's representative stated that Plaintiff had been "turned down," but "not to worry" because the dealer would obtain the necessary financing.

86. Plaintiff was at the dealership for approximately three hours.

14

87.    Eventually, the dealership stated that they had obtained financing on Plaintiff's behalf, and Plaintiff was presented with the RIC.

88.    This occurred only after Plaintiff advised the dealer's representative that she was becoming tired would have to leave, with her cash down payment.

89.    Before being asked to sign the RIC, Plaintiff was not advised of the required TILA disclosures, orally or in writing, other than being told the amount of the monthly payments she would be obligated to make under the RIC, and the total number of such payments.

90.    Instead, when Plaintiff decided to purchase the vehicle, she was presented with a stack of documents containing signature lines marked by the letter "X."

91.    When they provided Plaintiff with the above-referenced papers, the sales staff with whom Plaintiff was conferring informed her that the papers were "her contract," and that she should "sign every signature line marked with an 'X.'"

92.    The stack of papers contained not only Plaintiff's RIC, but also a document entitled "GAP ADDENDUM." A copy of the GAP ADDENDUM was originally attached as Exhibit B to Plaintiff's initial complaint; a more legible copy of which was subsequently produced by Santander's counsel and is incorporated herein by reference.

93.    The document entitled "GAP ADDENDUM" purported to sell Plaintiff a debt-cancellation agreement, purportedly absolving her of liability for the unpaid balance of the RIC in the event of a total loss of the collateral (under certain circumstances).

94.    The "GAP ADDENDUM" imposed an additional charge upon Plaintiff of $895.00 (the "GAP Charge").

15

95.     Disclosure of the GAP Charge was not provided to Plaintiff in a form she could keep before consummation of the credit transaction.

96.     The GAP Charge was included in the "Amount Financed," and not in the "Finance Charge."

97.     The "GAP ADDENDUM" imposes "Program Limits," including a "Maximum APR" of 24.00%.

98.     The APR on the RIC exceeded the Program Limit, thus rendering the GAP ADDENDUM void and worthless, pursuant to its own terms (*See* Exclusion K).

99.     The sales staff with whom Plaintiff conferred did not inform her before providing her with documents to sign, and instructing her to sign any line marked with an "X," that the documents included the "GAP ADDENDUM."

100.    The "GAP ADDENDUM" itself did not state that the payment of the GAP Charge was voluntary, but rather stated "[a]lthough not required to do so, you elect to purchase this Addendum."

101.    The signature line of the "GAP ADDENDUM" was marked with an "X."

102.    Because she had been instructed to sign all lines so marked, Plaintiff signed the "GAP ADDENDUM" without understanding that she was making an additional purchase, but rather believed the document was part of the RIC.

103.    The sales staff with whom Plaintiff conferred did not inform her, before signing the RIC, that she would be presented the opportunity to purchase a GAP ADDENDUM, or that such purchase was not required and would not be a factor in the decision to extend credit.

104.    Before being given either the RIC or the GAP ADDENDUM to sign, Plaintiff was not delivered any disclosures whatsoever regarding the GAP ADDENDUM or the GAP Charge.

105.    Indeed, Plaintiff was completely unaware that she had signed the GAP ADDENDUM, or that such signature represented an additional "non-required" purchase, until she conferred with her attorneys regarding the sale due to a concern unrelated to the TILA.

106.    Had Plaintiff been provided adequate disclosures about the nature of the GAP ADDENDUM as an additional, non-required purchase with an $895.00 cost, she would not have signed the GAP ADDENDUM. The only reason Plaintiff signed the GAP ADDENDUM was because she was led to believe it was a mandatory form connected with her RIC.

107.    Because of the inadequate disclosures, Plaintiff has been saddled with so-called GAP "protection" that was not only undesired, but that is worthless because the APR imposed by her RIC (27.06%) exceeds the program's maximum APR of 24%.

108.    This worthless add-on was imposed upon Plaintiff as a result of Santander's discriminatory practice of encouraging dealers to aggressively market such add-ons and interest rate markups after approving the deal at the buy rate.

109.    If Santander had not ensnared Plaintiff in a discriminatory loan deal, Plaintiff would have used her cash down payment to purchase a different vehicle at a lower price, possibly at another dealership.

110.    Due to Santander's discriminatory conduct, Plaintiff was damaged by having to pay inflated interest payments and a worthless, illusory GAP "protection" fee, among other damages.

111.    Plaintiff therefore brings this action on behalf of herself and other similarly-situated black women who have been damaged due to Santander's discriminatory indirect automobile lending policies and practices.

### FIRST CLAIM FOR RELIEF
### *Violation of the Truth in Lending Act*

112.    Plaintiff incorporates paragraphs 1-111, alleged above, into this claim for relief.

113.    The Truth in lending Act, 15 U.S.C. § 1638(b)(1) mandates timely and accurate written disclosures of financing terms, prior to consummation of a credit transaction.

114.     Regulation Z, 12 C.F.R. § 226.17(a), interpreting TILA, states in relevant part:

> *(a)    Form of disclosures*
> *(1)    the creditor shall make disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep....*

115.    Regulation Z. 12 C.F.R. § 226.18 sets forth the content of the disclosures required by TILA.

116.    The financing terms that must be accurately and timely disclosed include the "Amount Financed" and the "Finance Charge" as defined in 15 U.S.C. § 1605(a).

117.    15 U.S.C. § 1638(a)(2)(A) explains how the "Amount Financed" and "Finance Charge" shall be computed, starting with the cash price less any down payment and/or trade-in.

118.    Charges paid to a third party are excluded from the finance charge only "if the creditor does not require the imposition of the charges or the services provided and does not retain the charges." 15 U.S.C. § 1605(a).

119.    Regulation Z. 12 C.F.R. § 226.4, interpreting 15 U.S.C. § 1605, states, in pertinent part, that the finance charge "includes any charge payable directly or indirectly by the consumer as an incident to [...] the extension of credit."

120.    Plaintiff's RIC lists the cash price of the vehicle as $13,000 and discloses a down payment of $2,000.00, reducing the cash price to $11,000. With amounts for GAP "insurance" ($895.00), documentary fees, and taxes, the "Amount Financed" is disclosed as $13,537.00, according to the RIC's TILA disclosure.

121.    Plaintiff's RIC discloses the "Finance Charge" as $14,247.00.

122.    Both the "Amount Financed" disclosure and the "Finance Charge" disclosures on Plaintiff's RIC are inaccurate.

123.    Plaintiff's $895.00 GAP Charge is memorialized by the aforementioned GAP ADDENDUM, which specifies that the maximum permissible APR for the GAP "Program" is 24%.

124.    Exclusion K of the GAP ADDENDUM explicitly provides that the Addendum "does not provide coverage for loss [...] where the Financing Contract has an annual percentage rate (A.P.R.) in excess of the Maximum APR Limit shown on the front page of this Addendum."

19

125. The Maximum APR Limit shown on the front of Plaintiff's GAP ADDENDUM in 24.00%

126. Plaintiff's RIC has an APR of 27.06%.

127. Defendant's "Amount Financed" TILA disclosure is not accurate, because it includes the cost of the GAP ADDENDUM, which should have been included in the "Finance Charge" pursuant to TILA due to: (1) the fact that the protection is a worthless and deceptive product primarily used to pad loan transactions and improperly increase the amount financed with what is really profit, and part of the finance charge; and (2) the fact that protection was issued in connection with a loan with an APR greater than the maximum 24% APR, and is therefore worthless because it is outside of Program Limits.

128. According to Exclusion K, cited above, selling GAP protection outside of the program limits renders the GAP ADDENDUM worthless, because Plaintiff is not entitled to coverage on the Addendum for her RIC with an APR in excess of 24%.

129. Therefore, the $895.00 GAP Charge was not a charge or premium paid for debt cancellation coverage for an amount exceeding the value of the collateral, nor was it a charge or premium paid for debt suspension coverage of any type; rather, under the terms of the GAP ADDENDUM, the GAP Charge entitles Plaintiff to no coverage at all.

130. Because the GAP Charge was not a charge or premium paid for the relevant coverage, it must be excluded from the "Amount Financed" amount, and cannot be excluded from the calculation of the "Finance Charge."

131. The fact that Plaintiff's GAP ADDENDUM is worthless due to the interest rate of her RIC exceeding the maximum rate proscribed by the ADDENDUM for a recovery for loss, and the fact that Plaintiff's "GAP Charge" is nevertheless excluded

from the calculation of the "Finance Charge," are apparent from the face of financing documents, specifically the RIC and the GAP ADDENDUM.

132.    As an assignee of the RIC and a party to the GAP ADDENDUM, Defendant Santander had access to both Plaintiff's RIC and Plaintiff's GAP ADDENDUM.

133.    The failure to properly disclose the GAP Charges paid by Plaintiff and class members contributed to Plaintiff's and class members' mistaken and/or under-informed enrollment in a so-called "GAP Program" that imposed fees of hundreds of dollars but provided no actual protection.

134.    As a result, the true cost of credit was never disclosed to Plaintiff or any of the members of the proposed class in accordance with the TILA, and therefore they are entitled to damages pursuant to 15 U.S.C. § 1640.

**SECOND CLAIM FOR RELIEF**
***Violation of the Illinois Motor Vehicle Retail Installment Sales Act***

135.    Plaintiff incorporates paragraphs 1-111, alleged above, into this claim for relief.

136.    The Illinois Motor Vehicle Retail Installment Sales Act ("IMVRISA"), 815 ILCS 375/1 *et seq*., governs the installment sale of vehicles in Illinois.

137.    Plaintiff purchased a motor vehicle as that term is defined by the IMVRISA, 815 ILCS 375/2.1, pursuant to a retail installment transaction, 815 ILCS 375/2.4, the terms of which were reflected in a RIC. 815 ILCS 375/2.5.

138.    Finance charges under the IMVRISA, are defined to include charges such as the GAP ADDENDUM. *See*, 815 ILCS 375/2.9.

139.     The IMVRISA requires proper disclosures of the finance charge assessed under the contract. 815 ILCS 375/5.

140.     815 ILCS 375/5 provides: "A retail installment contract which complies with the federal Truth in Lending Act, amendments thereto, and any regulations issued or which may be issued thereunder, shall be deemed to be in compliance with the provisions of this Section." But as alleged in the First Claim for Relief, the RIC signed by Plaintiff and assigned to Santander did not comply with the Truth in Lending Act. Plaintiff incorporates paragraphs 39-60 for the purposes of showing non-compliance with the TILA.

141.     815 ILCS 375/24 provides:

> (b)      No person who violates this Act, except as a result of an accident or bona fide error of computation, may recover any unpaid finance charge, delinquency or collection charge, or refinance charge in connection with the related retail installment contract.

142.     Defendant Santander must disgorge all finance charges collected from Plaintiff and the class members pursuant to 815 ILCS 375/24.

## THIRD CLAIM FOR RELIEF
### *Violation of the Equal Credit Opportunity Act*

143.     Plaintiff incorporates paragraphs 1-111, alleged above, into this claim for relief.

144.     Santander is a creditor as defined in Regulation B, Section 202.2(1) of the ECOA.

145.     Plaintiff, as a black woman, is a member of that protected group.

146.     In the ordinary course of business, Santander participated in every decision of whether or not to extend credit to Plaintiff and all prospective class members.

147.     At all times relevant to this complaint, Santander was aware of the policy and practice that resulted in the discrimination described herein and, in fact, designed, controlled, implemented, and profited from the discriminatory policy and practice of permitting dealer rate markups and paying to dealers a "reserve" or "participation."

148.     Santander is creditor as defined in Regulation B, Section 202.2(1), in the capacity of a lender, in that all discriminatory actions that were taken by Santander dealers were in accordance with the specific authority granted to dealers by Santander, all discriminatory actions were implemented using various forms and documents provided by Santander, all discriminatory actions were taken in furtherance of Santander's goals and objectives, and all discriminatory actions financially benefitted Santander.

149.     Santander delegated to dealers the authority to markup financial charges without regard to credit risk factors pursuant to the Santander markup policy that resulted in unlawful discrimination.

150.     Santander is creditor as defined in Regulation B, Section 202.2(1), in the capacity of an assignee, since Santander, in the ordinary course of its business, participated in every decision of whether or not to extend credit to Plaintiff and all class members.

151.     Santander is liable for any and all ECOA violations committed by dealers associated with a Santander Retail Installment Contract as the assignee of the dealers.

152.     The ECOA prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status or age.

153.     Santander discriminated against Plaintiff on the basis of her identity as a black woman with respect to the credit transaction that was arranged by Santander.

154.     On information and belief, Santander treated Plaintiff differently than similarly situated consumers who are not black women, with respect to the credit transaction.

155.     Moreover, empirical evidence demonstrates that a discriminatory disparate impact in credit discrimination exists against black women in the automobile industry..

156.     The deficit that black women experience in the outcomes of negotiated credit transactions persists across the indirect auto financing industry.

157.     Santander is one of the major auto lenders in the country, and like companies such as GMAC and NMAC (companies that have also been sued based upon the above-demonstrated disparities between outcomes for minority and white buyers), it was one of the top 20 automobile lenders in in the U.S. by market share as of 2010. *See* http://www.autoremarketing.com/mobile/financial-services/santander-quietly-bolsters-us-auto-loan-market-share.

158.     Santander's credit pricing policy, although facially neutral, has a disproportionately negative effect on black women.

159.     The average of the discretionary non-risk related charges (i.e. "add-ons") imposed on the plaintiff and other black women pursuant to Santander's markup policy were significantly greater than the average discretionary non-risk related charges imposed on white consumers.

160.     The disparities between the terms of the credit transactions involving black women and the terms involving white consumers, and white men specifically, could not have occurred by chance and cannot be explained by factors unrelated to race and gender.

161.     Santander's policies and practices constitute patterns or practices of resistance to the full enjoyment of rights secured by the ECOA, and constitute discrimination against applicants with respect to credit transactions on the basis of race and gender in violation of the ECOA and Regulation B.

162.     Pursuant to a disparate impact analysis, Plaintiff specifically alleges that:

a)     The specific facially neutral Santander practices that Plaintiff is challenging are Santander's practices of permitting dealer rate markups and paying dealers "reserve" or "participation" for negotiating such markups, and encouraging and incentivizing dealerships to impose rate markups and add-ons.

b)     The disparity between the frequency and the amount of markup imposed on black women and that charged similarly situated white men indicates a clear causal connection between the markup policy and the discriminatory result.

c)     The disparities that exist are consistently evidenced by a statistical review of adequate, competent, and relevant data sets.

d)     There are no legitimate business reasons to justify Santander's discriminatory markup policy that could not be achieved by a practice that has a far less discriminatory impact.

163.     Plaintiff and prospective class members are aggrieved persons as defined by the ECOA and has suffered damages as a result of Santander's discriminatory conduct.

164.     These damages include, but are not limited to, inflated interest payments made pursuant to Plaintiff's discriminatory interest rate,

165.     The discriminatory charges that were charged to Plaintiff and the class members arose directly from "credit transactions" as defined in Regulation B, Section 202.2(m).

25

166. The discriminatory charges that resulted from Santander's discriminatory policies and practices were over and above the charges that Plaintiff and class members were eligible for based on their credit risk rating.

167. Plaintiff, on behalf of both herself and on behalf of all similarly situated black women, brings suit against Santander seeking appropriate class certification, damages, equitable relief, and injunctive relief from Santander's discriminatory policies and practices.

## CLASS ACTION ALLEGATIONS

168. This case is brought on behalf of a two classes of similarly situated consumers, defined as follows:

"TILA Class": All consumers who, in the State of Illinois and in connection with the purchase of a vehicle pursuant to a RIC, signed a "Gap ADDENDUM" reflecting an APR in excess of the "Program Limit" printed on the GAP ADDENDUM. The class period is 1-year before the filing of this action for the TILA claim, and 5 years before the filing of this action for the claims under the IMVRISA.

"ECOA Class": All consumers who 1) indirectly financed their automobile purchase; 2) in a transaction where Santander was the Indirect Auto Lender; 3) who are both black and women.

169. Excluded from the Classes are Defendant, its legal representatives, assigns, and successors, and any entity in which Defendant has a controlling interest. Further excluded are Plaintiff's attorney(s). Also excluded is the judge assigned to this case, as well as the staff of the judge and the judge's immediate family.

170. Defendant's September 2014 consumer bond offering alone was backed by loans made in connection with more than 84,000 vehicles.

170. On information and belief, and based upon studies including those cited above showing that black women participate in the indirect automobile financing market

at proportional rates, hundreds if not thousands of those loans were made to black women.

172.     In 2011, 34.9% of all automobile purchases involving a Retail Installment Contract included the purchase of GAP protection.

173.     Upon information and belief, the "Maximum APR" for the "GAP Program" at issue is not determined on an applicant-specific basis, and a form Addendum for the purchase of GAP protection reflecting a Maximum APR was used in most or all of the automobile purchases, on credit, that include the purchase of such GAP protection.

174.     Therefore, upon information and belief, the members of the proposed classes are so numerous that joinder of all members is impracticable.

175.     Plaintiff will fairly and adequately represent and protect the interests of the classes' members. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the classes, and have the financial resources to do so. Neither Plaintiff nor her counsel has any interest adverse to those of the other members of the class.

176.     Absent a class action, most members of the classes would find the cost of litigating their claims to be prohibitive, or due to the faulty disclosures at issue might not be aware of such claims, and will therefore have no effective remedy.

177.     There are many questions of law and fact common to the claims of Plaintiff and the other members of the classes, and those questions predominate over any questions that may affect individual members of the classes. Common questions for the classes include but are not limited to the following:

       (a)      Is GAP Protection a worthless and deceptive product primarily used to pad loan transactions and improperly increase the amount financed with what is really profit?

       (b)      Should a "GAP Charge" paid pursuant to a GAP Addendum executed in connection with a RIC reflecting an APRs in excess of the Addendum's specified Maximum APR be included in the calculation of the "amount financed" under TILA?

       (c)      Do Santander's indirect automobile loan policies and practices produce a disparate impact on the interest rate, finance charge, and add-on charge outcomes of black women financing their automobile purchases?

178.    Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

179.    The factual and legal bases of Santander's liability to Plaintiff and to the other members of the classes are the same, resulting in injury to the Plaintiff and to all of the other members of the classes as a result of the discriminatory conduct and faulty disclosures alleged herein. Plaintiff and the other members of the classes have all suffered harm and damages because of Santander's conduct.

**INJUNCTIVE RELIEF**

180.    Plaintiff incorporates all other paragraphs contained in the complaint.

181.    Pursuant to 15 U.S.C. § 1691e(c) and the inherent authority of this Court, appropriate injunctive relief should prohibit further use of Santander's challenged policies and practices, as they presently exist, and/or require Santander to implement a dealer compensation system that does not have a discriminatory impact on black women. Plaintiff suggests that in order to prevent a discriminatory impact, such a system should include all or some of the following:

a. Prohibition of non-risk related finance charge markups; or,

b. Alternatively, restrictions limiting markup to a fixed amount for all

customers;

c. Limitation of markup to a fixed percentage;

d. Disclosure of markup to the customer;

e. ECOA training of Santander employees;

f. Standards requiring Santander to monitor and/or audit the racial patterns

and impacts related to interest rate markup and add-on charges; and

g. Such other injunctive and/or declaratory provisions which eliminate the

discriminatory effect of the Santander's policies and practices and serve

the purposes of the ECOA

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff JOYCE PETTYE, by and through her attorneys, on

behalf of herself and the proposed classes, prays for the following relief against

Defendant, SANTANDER CONSUMER USA, INC.:

(A)   An order certifying this case as a class action on behalf of the Class as defined above, appointing Joyce Pettye as class representative, and appointing her counsel as class counsel;

(B)   A judgment pursuant to 15 U.S.C. § 1691e(c) declaring that the acts and practices of Santander complained of herein are in violation of the ECOA;

(C)   A permanent injunction pursuant to 15 U.S.C. § 1691e(c) enjoining Santander from continuing to utilize a credit pricing policy that has a discriminatory impact on black women;

(D)   An order pursuant to 15 U.S.C. § 1691e(c) directing Santander to adopt and enforce a credit pricing policy and/or dealer compensation policy without discriminatory effect, and which complies with the ECOA;

29

(E)     Disgorgement, pursuant to 15 U.S.C. § 1691e(c), of all disproportionate non-risk charges imposed on black women by Santander's policies and practices, and equitable distribution of such charges, as restitutionary relief, to all appropriate class members;

(F)     Actual damages pursuant to 15 U.S.C. § 1640(a)(1) and 15 U.S.C. § 1691e(a), in an amount to be determined at trial;

(G)     Statutory damages pursuant to 15 U.S.C. § 1640(a)(2);

(H)     Punitive damages pursuant to 15 U.S.C. § 1691e(b);

(I)     Reasonable attorneys' fees and costs, including expert fees, pursuant to 15 U.S.C. § 1640(a)(3) and 15 U.S.C. § 1691e(d);

(J)     Disgorgement of all finance charges collected pursuant to 815 ILCS 375/24; and

(K)     Any other relief the Court deems just and appropriate.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.


Respectfully submitted,
Joyce Pettye, Plaintiff

By:
/s/ James P. Batson
*One of Her Attorneys*

James P. Batson, Esq.
150 N. Michigan Ave., Ste. 800
Chicago, IL 60601
(914) 523-2278
jamespbatsonlegal@gmail.com

Christopher V. Langone, Esq. ***(LEAD TRIAL COUNSEL)***
150 N. Michigan Ave., Ste. 800
Chicago, IL 60601
(607) 592-2661
langonelaw@gmail.com