**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOYCE PETTYE, | ) | |
| Plaintiff, | ) | **Case Number: 1:15-cv-7669** |
| v. | ) | |
| | ) | **Judge: Hon. Amy J. St. Eve** |
| SANTANDER CONSUMER USA, INC., | ) | **Magistrate: Hon. Maria Valdez** |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN
OPPOSITION TO DEFENDANT'S RULE 12 MOTION**

This lawsuit seeks redress for predatory practices by subprime lender Santander Consumer USA, Inc. ("Santander") in connection with the financing of automobile loans. Santander's practices have come under scrutiny by federal and state regulators nationwide. These practices have a particularly insidious discriminatory impact on black women, like the Plaintiff in this case. Plaintiff was induced to finance a loan with Santander at an outrageous and usurious interest rate of 27%. Further, her loan was further padded with the sale of a void and worthless "GAP Addendum," which offered her no protection and was pure profit to Defendant Santander and the car dealer that originated the loan on its behalf.

Defendant moves to dismiss these claims, but the motion should be denied. As to the ECOA claims, Defendant cites three cases construing the ECOA: two of these were Rule 12 decisions, both of which *denied* the motion to dismiss; the third was a summary judgment decision that Defendant misleading implies ruled on the sufficiency of the pleadings. As to the TILA claims, Defendant fails to meet its burden of showing that the GAP fee was properly excluded from the finance charge under the regulations governing debt-cancellation coverage because Plaintiff did not, in fact, receive actual debt-cancelation coverage.

After the filing of Plaintiff's original complaint, Plaintiff learned that the Consumer Financial Protection Bureau had initiated an investigation into whether Defendant's practice of paying "dealer reserve"[1] and promoting "add-on"[2] products violated the ECOA by producing a disparate impact in loan outcomes in groups such as minorities and women. Soon thereafter, auto-industry lenders succeeded in lobbying the U.S. House of Representatives to vote to strip the CFPB of its power to investigate this pressing consumer issue (H.R. 1737). Notably, this provision has not become law. Nonetheless, this development prompted Plaintiff to investigate Defendant's "dealer reserve" and "add-on" policies in the context of targeting her based on her identity as a black woman. As a result of this investigation, Plaintiff amended the complaint to add an ECOA claim.

Now, Defendant has filed another Rule 12 motion. In relation to Plaintiff's ECOA Count, Defendant has added to its briefing a mere 3 pages, arguing principally that Plaintiff's allegations are too "general." Just as Defendant's TILA argument ignores the primary deficiency in its reasoning (that Plaintiff was sold a product that provided no value and was merely an excuse to inflate the purchase price of the loan), Defendant's ECOA argument is underdeveloped and asks the Court to dismiss Plaintiff's ECOA claim on the basis of Rule 12 cases that deny such motions with near-identical facts, and a summary judgment decision in a case where the statistical evidence was found only after the opportunity for discovery.

---

[1]  "Dealer reserve" (sometimes called participation) is a practice in automobile lending similar to the yield-spread premium (YSP) in the mortgage context. Indirect lenders such as Santander circulate "rate sheets" to dealers identifying the "buy rate" (i.e. interest rate) at which they will accept a finance contract for consumers in various credit tiers. An example of what a rate sheet might look like is attached as <u>Exhibit A</u>. If the dealer generates a contract at a higher interest rate then the dealer and Santander split the extra money. *See* Amended Complaint, ¶¶ 10-19.

[2]  "Add-ons" refer to F&I products such as debt-cancellation insurance, window-etching, rustproofing, credit life and disability insurance, extended service contracts, etc.

## I.      Plaintiff Alleged a Plausible Claim for Relief Under the ECOA

The Equal Credit Opportunity Act ("ECOA") prohibits discrimination in credit transactions, including discrimination cases based on a "disparate impact" theory. *Zamudio v. HSBC North America Holdings, Inc.* 2008 WL 517138 at *2 (N.D. Ill. 2008); *Latimore v. Citibank, F.S.B.,* 979 F. Supp. 662, 664, fn. 7 (N.D.Ill.1997); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,* 558 F.2d 1283, 1288-90 (7th Cir.1977); *Cf. Smith v. City of Jackson*, 544 U.S. 228, 241 (2005).

Defendant argues that Plaintiff fails to allege an ECOA claim because Plaintiff has not identified a specific discriminatory policy, relies on "general" statistics, and has not alleged discriminatory animus by Santander. This last assertion is irrelevant to a discriminatory impact claim – a plaintiff proceeding on a disparate impact theory need not allege racial or gender animus. *Grant v. Bethlehem Steel Corp.,* 635 F.2d 1007, 1014 (2nd Cir.1980) ("Proof of motive is not required to sustain a claim of disparate impact."); *EEOC v. Chgo. Miniature Lamp Works,* 947 F.2d 292, 297 (7th Cir. 1991)("In a disparate impact case, however, motive is irrelevant"). Moreover, contrary to Defendant's assertion, Plaintiff identifies specific, facially-neutral, practices that cause a disparate impact on black women: (1) that of awarding a dealer reserve, and (2) the promotion and financing of add-on products, such as the so-called "GAP Addendum" (Amended Complaint at ¶¶ 158, 159, & 162(a)).

Rather than directly dispute that Plaintiff has alleged particular practices that have a causal relationship with the discriminatory impact on the protected group of which Plaintiff is a member, Defendant mounts a more vague attack on Plaintiff's use of so-called "generalized" statistics. Defendant at times seems to be taking issue with particular studies cited in Plaintiff's complaint that demonstrate industry-wide impacts of dealer reserve and related practices

employed by Santander and other institutions in equal measure ("However, general statistics are not enough alone to establish a *prima facie* claim for disparate impact under the ECOA," Def.'s Memo. at p. 14.) But Defendant does not cite a case holding that only statistics specific to a particular plaintiff can be used to support a disparate impact claim at the pleadings stage (such a holding would make such claims impossible to allege, much less prove).

Indeed, Defendant misrepresents the single case it does cite on the issue of what it calls "general statistics" - *A.B. & S. Auto Serv., Inc. v. S. Shore Bank of Chicago*, 962 F. Supp. 1056 (N.D. Ill. 1997). Implying that *A.B. & S.* was a ruling on the pleadings, Defendant adds its own language to its pinpoint quotation from the case. There, the court questioned the usefulness, at the summary judgment stage (and after expert discovery), of statistics "of a very general nature [that] do not relate specifically to the policy identified as having a discriminatory impact" 962 F. Supp. at 1061. Defendant misrepresents this holding by adding its own language to the prior phrase: "[such statistics] *do not satisfy the pleading requirement for an ECOA disparate impact claim*." (Def.'s Memo. at p. 14, emphasis added.) The italicized language is nowhere to be found in the *A.B. & S.* opinion. The court in *A.B. & S.* said nothing at all about the pleading requirements for an ECOA disparate impact claim, because *A.B. & S.* was a summary judgment decision, rejecting plaintiffs' attempt to use statistics insufficiently-related to the parties to *prove the case*, and holding that plaintiffs there failed to meet their *evidentiary* burden. There is nothing suggesting that such statistics, along with allegations concerning Defendant's market share, allegations concerning regulatory action taken against Defendant for the challenged conduct, specifically, and allegations concerning Plaintiff's individual experience, cannot be used to support the plausibility of Plaintiff's claim in the face of a Rule 12 challenge.

4

Elsewhere, Defendant's attack on the Amended Complaint's so-called "general" allegations might more appropriately be construed as an attack on the adequacy of Plaintiff's policy and practice allegations (e.g., "it is insufficient to point to general policy, but rather plaintiff must isolate a specific practice allegedly responsible for statistical disparities," Def's. Memo. at p. 14.) But other than citing to case law referencing the issue – cases that, as discussed below, actually support denial of the motion to dismiss – Defendant does not even discuss Plaintiff's specific policy and practice allegations. Instead, Defendant simply makes a blanket assertion about "general policy" with no discussion, and cites two cases – both of which denied motions to dismiss ECOA claims challenging similar practices in a mortgage loan context.

In *Hoffman v. Option One Mortgage Corp.,* 589 F. Supp. 2d 1009, 1011 (N.D. Ill. 2008), the plaintiffs alleged that "Statistical analysis of discretionary charges imposed on minority and white customers of other mortgage companies that use credit pricing systems structured like that of Option One and/or H & R Block Mortgage has revealed that minorities, after controlling for credit risk, are substantially more likely than similarly situated whites to pay such charges"; that "the subjective charges imposed under the Policy disproportionately adversely affect minorities"; that "payment of yield spread premiums or other broker compensation and the use of adjustable rate mortgage products" cause the disparate impact, and "that plaintiffs paid more subjective charges for their loans than white borrowers as a result of the Policy." The court found these allegations sufficient to withstand a Rule 12 motion, and rejected the defendants' challenge to the plaintiffs' use of industry-wide data and studies. 589 F. Supp. 2d at 1011, stating:

> Plaintiffs must identify a specific practice or policy responsible for the disparate impact. *See Smith*, 544 U.S. at 241, 125 S.Ct. 1536 (explaining that it is insufficient to point to general policy, but rather plaintiff must isolate specific practice allegedly responsible for statistical disparities). Defendants argue that plaintiffs have not identified a specific policy, but rather attack defendants' overall loan pricing policies. But the complaint focuses on the subjective charges assessed pursuant to defendants' "Discretionary Pricing

Policy" ("Policy")—not the overall pricing process, which also encompasses charges imposed based on "objective risk-related" criteria.

Similarly, in *Steele v. GE Money Bank*, 2009 WL 393860 the plaintiffs alleged "that the defendants 'designed, disseminated, controlled, implemented and profited from the discriminatory policy and practice,'"[...], authorized their brokers and correspondent lenders to impose non-risk-based charges, including YSPs and other discretionary fees, and "regularly communicated applicable par rates, authorized yield spread premiums, and other discretionary fees to brokers and correspondent lenders via 'rate sheets' and other communications," [citations omitted], and that "the defendants' facially neutral "Discretionary Pricing Policy" was a means of 'systematically giving [Plaintiffs] mortgage loans with less favorable terms than were given to similarly situated non-minority borrowers.'"

The *Steele* court held that those plaintiffs adequately alleged a specific policy or practice and that a causal relationship existed between the alleged policy and the alleged disparate impact. The court noted that the complaint adequately defined the particular practice for which it alleged the defendants were responsible, and later stated: "[T]he complaint plausibly points the finger at the defendants' alleged practices and thus provides sufficient detail to give the defendants fair notice of the nature of the plaintiffs' argument about causation and the ground upon which it rests." *Steele v. GE Money Bank*, No. 08 C 1880, 2009 WL 393860, at *5 (N.D. Ill. Feb. 17, 2009) *citing Limestone Dev. Corp. v. Village of Lemont,* 520 F.3d 797, 803 (7th Cir.2008).

The court in *Steele* also opined on the plaintiff's disparate impact allegations, which, as here, made heavy use of statistics supporting the plausibility of the existence of such an impact. In rejecting the defendants' objections to such statistics, the court held: "It is well established that statistics may be used to support a disparate impact claim." *Steele* at *4 *citing Teamsters v.*

*United States,* 431 U.S. 324, 339 (1977). The opinion continues: "the court, however, need not delve into the degree that statistics by themselves can support a claim of disparate impact because the plaintiffs do not rely exclusively on statistics. Instead, they allege that they were harmed by specific policies put in place by the defendants, and that this caused them to pay more than similarly situated non-minority borrowers." *Id.*

Here, while Plaintiff appropriately made use of a number of statistics in support of her claim, as in *Steele*, she hardly relies upon them exclusively. Rather, Plaintiff's complaint discussed extensively the sociological mechanisms by which Defendant's facially neutral discretionary pricing policies brought about a disparate impact in loan outcomes upon blacks, women, and black women in particular. Relating these mechanisms to her own experience, Plaintiff's complaint notes how her loan was saddled additional charges for products she was unaware to have purchased, with an interest rate so high that it exceeded the program limits on one of those products entirely, with Santander happily splitting the proceeds with its dealer. Plaintiff ties Defendant's discretionary pricing policy directly to the impact both experienced by her protected group in the aggregate, and by her in particular, via her own loan outcome (which, as argued above, independently violates state and federal lending laws). Plaintiff's allegations are at least as well-developed as those in *Hoffman* and *Steele*, and more than adequately and plausibly support Plaintiff's claim for relief against a Rule 12 challenge.

The decisions in *Hoffman* and *Steele* are consistent with other Rule 12 decisions examining ECOA claims involving discretionary markups in auto financing. *See, e.g., Jones v. Ford Motor Credit Co.,* 2002 WL 88431 at *4 (S.D.N.Y. Jan. 22, 2002) ("Although plaintiffs concede that the first stage of the credit evaluation consists of considering objective risk-based factors, their claim against Ford Credit is aimed at the role Ford Credit plays in authorizing

subjective mark-ups in the second stage. Taking plaintiffs' allegations as true, that Ford Credit is

involved in a subjective scheme which has a disproportionate negative effect on African–

Americans, plaintiffs have stated a claim for disparate impact. Other courts have come to similar

conclusions regarding the right of plaintiffs to bring disparate impact claims under the ECOA");

*Smith v. Chrysler Fin. Co.*, 2003 WL 328719 at *7 (D.N.J. Jan. 15, 2003) ("This court does not

agree with Defendant's argument that Plaintiffs failed to identify a specific practice or policy that

resulted in the alleged discrimination. [...] Defendant argues that their actions are not improper

because they are simply following a recognized business practice within the financial industry.

These arguments are not compelling because the law does not allow subjective mark-up policies

that result in discrimination against a protected class absent a valid business justification.

[citations omitted] Defendant fails to provide a valid business justification for its actions that

result in discrimination") *citing Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 657 (1989),

*Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971).

    In alleging her disparate impact claim, Plaintiff identified as the challenged policy

precisely the sort of discretionary subjective mark-up practices that were at issue in *Jones* and

*Smith*. Where this sort of facially neutral policy introduces subjectivity into the credit evaluation

process, and a disparate impact results, as alleged here, the facts sustain an ECOA claim. *Jones*

at *3 ("The Official Staff Interpretations of Regulation B explain that the effects test disallows 'a

creditor practice that is discriminatory in effect because it has a disproportionately negative

impact on a prohibited basis, even though the creditor has no intent to discriminate and the

practice appears neutral on its face.'") *citing* 12 C.F.R. Part 202, Supp. I, § 202.6(a)(2).

Moreover, "[s]tandardized criteria within a business practice can be used as evidence of a

disparate impact." *Smith* at *7 ("This Court finds that Plaintiffs have identified a practice or

policy that could cause a disparate impact upon African–Americans, and Defendant has failed to provide a valid business justification which cannot be achieved in a non-discriminatory manner"). Indeed, not a single opinion has been cited to this Court whereby a rule 12 motion was granted relative to allegations involving the dealer reserve practice.

All in all, the Amended Complaint states a claim under the ECOA because it:

(1)     Alleges that Defendant, the indirect lender and ECOA creditor (Amended Complaint at ¶¶ 6-8, 144, & 146) engaged in a discretionary pricing policy wherein dealers were permitted to negotiate credit prices above what Defendant was willing to accept (Amended Complaint at ¶¶ 9-20), imposing yield spread premiums and add-on charges on consumers without disclosure of the discretionary policy (Amended Complaint at ¶¶ 30-32).

(2)     Incorporates a rich body of statistical evidence concerning both Santander and the auto-finance industry at large that black women, a protected group, experience a disparate impact in the form of demonstrably worse credit loan outcomes when compared to the population at large, and white men in particular (Amended Complaint at ¶¶ 21-24, 25-29 [Devlin study], ¶¶ 34-35 & 42 [Cohen study], ¶¶ 36-38 [CFPB data], ¶¶ 40, 45-47 [American Economic Review study], ¶¶ 55-56 [Ayres study]). The complaint also discusses the sociology of intersectionality – the effect of simultaneous beings in more than one protected class (Amended Complaint at ¶¶ 48-55).

(3)     Claims that this disparate impact is caused by the discretionary pricing policy that exposes Plaintiff and members of the protected to class to discriminatory loan outcomes (Amended Complaint at ¶¶ 158-159 & 162), and ties these practices to Santander specifically through investigative journalism and the CFPB (Amended Complaint at ¶¶ 64-68).

## II.     Plaintiff Alleged a Plausible Claim for Relied Under the TILA & IMVRISA

Congress enacted TILA "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair billing and credit card practices." 15 U.S.C. § 1601(a) "In order to effectuate this purpose, TILA requires creditors to disclose clearly and accurately to consumers any finance charge that the consumer will bear under the credit transaction. [] These stringent disclosure requirements are designed to prevent creditors from circumventing TILA's objectives by burying the cost of credit in the price of the goods sold." *Walker v. Wallace Auto Sales, Inc*., 155 F.3d 927, 930 (7th Cir. 1998); *citing Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 364 (1973); *see also Gibson v. Bob Watson Chevrolet–Geo, Inc.*, 112 F.3d 283, 285 (7th Cir.1997) (stating that TILA's purpose is "to protect consumers from being misled about the cost of credit").

In order to meet these charges, the TILA and its implementing regulation, Regulation Z, expressly define the particular sorts of charges that may be included in a RIC disclosure in the "amount financed" rather than disclosed as a "finance charge," as the charge in this case was. If a charge is not of the sort expressly identified by Regulation Z, it must be disclosed as a finance charge. Here, Defendant attempts to take shelter under the provision of Regulation Z permitting a debt cancellation coverage charge to evade a finance charge disclosure; but as alleged throughout the Amended Complaint, the charge at issue is not a debt cancellation coverage charge at all, notwithstanding Defendant's attempt to label it as such to avoid TILA's disclosure requirements.

The TILA violation alleged here is precisely the sort contemplated by the authority cited above. Plaintiff has been charged $895.00 for which she received absolutely nothing in return. The additional payment she made for GAP "protection" (unknowingly, as it happens), provided

her no debt cancellation coverage under any circumstances, and Defendant's disclosures are not permitted to cover up or obscure this fact by surreptitiously slipping the illusory charge into the amount financed as if it was a charge that provided Plaintiff anything of value.

      *A.*     *The charge at issue is not a "debt cancellation fee"*

Defendant's primary argument is that the charge at issue satisfies the three narrow requirements for when a *bona fide* debt cancellation fee may be disclosed as part of the "amount financed" rather than the "finance charge": "Under Regulation Z, [...] debt cancellation fees may be excluded from a finance charge in a car purchase if three requirements are met: A) the debt cancellation coverage is not required by the creditor and this fact is disclosed in writing; B) the fee or premium for the initial term of coverage is disclosed; and C) the consumer signs or initial an affirmative written request for coverage after being given the previous two disclosures." *Rodriguez v. Lynch Ford, Inc.*, No. 03 C 7727, 2004 WL 2958772, at *10 (N.D. Ill. Nov. 18, 2004). Defendant's arguments to this effect are off-point – they gloss over the dispositive question: whether or not the worthless, illusory GAP charge at issue meets the definition of a "debt cancellation fee" at all.

As noted, Regulation Z includes a carve out, discussed in *Rodriguez*, for so-called "debt cancellation fees." Specifically, 12 C.F.R. § 1026.4(b)(10) states that the amount disclosed as the "amount financed" may include "c]harges or premiums paid *for debt cancellation or debt suspension coverage* written in connection with a credit transaction, whether or not the coverage is insurance under applicable law." [emphasis added]. However, the GAP Addendum incorporated into the RIC by reference explicitly states that the charge provides no "coverage" for Plaintiff's RIC as required by 12 C.F.R. § 1026.4(b)(10). That the dealer may have committed fraud in conning Plaintiff into purchasing a worthless "protection" product is not at

issue; the dealer is not a party to this case. The question before the Court is whether Santander violated the TILA by consummating the deficient disclosures despite knowing that the unethical charge had tainted the TILA disclosures – and such a happenstance is precisely why the TILA imposes strict technical requirements on lenders.

>    B.    *Defendant's "GAP Protection" charge fails the test imposed by Regulation Z.*

Regulation Z's exception allowing so-called GAP protection or insurance products to be included in the amount financed requires strict compliance. *See, e.g. Rodriguez* at \*10 (denying summary judgment to defendant even where written voluntariness disclosures were adequately made pursuant to Regulation Z, due to a fact dispute about whether additional contrary oral statements were made). Particularly relevant to whether Defendant's GAP charge would satisfy the prerequisites for this exception is the second requirement, that "the fee or premium *for the initial term of coverage* is disclosed" *Id.* [emphasis added]. Here, Defendant could not have satisfied this condition, because, as discussed above, there was no initial term of coverage at all. By the plain language of Plaintiff's RIC and the addenda attached thereto, Plaintiff was not entitled to any coverage in consideration for the charge she paid that was designated a debt cancellation charge. Because the charge did not actually entitle her to any debt cancellation coverage or relief, it was not a "[c]harge[] or premium[] paid for debt cancellation or debt suspension coverage" 12 C.F.R. § 1026.4(b)(10).

>    C.    *The violation is apparent on the face of the documents*

The statute describes two ways in which an "apparent" violation can be detected: "(1) a disclosure which can be determined to be incomplete or inaccurate from the face of the disclosure statement or other documents assigned, or (2) a disclosure which does not use the terms required to be used by this subchapter." 15 U.S.C. § 1641(a).

Defendant's argument that the worthlessness of Plaintiff's so-called "GAP Protection" product is not apparent on the face of the documents is without merit. The Retail Installment Contract plainly on its face includes the illusory charge as part of the "amount financed" rather than the "financed charge." The GAP Protection Addendum incorporated into the RIC by reference states unequivocally that the product does not provide any coverage for Plaintiff's RIC, as required by Regulation Z in order to take shelter under the exception.

Defendant's cases on this issue do nothing to help its position. Defendant does not cite a case holding that a TILA violation present in the plain language of the Retail Installment Contract ratified by an assignee is not "apparent on the face of the documents." In fact, Defendant's precedent holds the opposite. Unlike the instant case, each of the cases cited by Defendant involves TILA violations arising from either representations or conduct committed by the originators of the loans without the creditors' knowledge.

For instance, in *Taylor v. Quality Hyundai, Inc.*, 150 F.3d 689 (7th Cir.1998), the Seventh Circuit considered the issue of assignee liability for an "amount paid to others on your behalf" disclosure that was inaccurate because the originating dealer failed to remit the disclosed amount to the relevant third parties. Importantly, in *Taylor*, there was no way for the defendant assignee to have discerned from the RIC and associated documents alone that the originator had not made the remitter it had claimed in the TILA disclosures. Thus, the Court ruled that "[o]nly violations that a reasonable person can spot on the face of the disclosure statement or other assigned documents will make the assignee liable under the TILA." *Taylor* at 694. However, this holding does not mean that only blatant errors of arithmetic can lead to assignee liability under TILA. *Taylor* merely held that "§ 1641(a) does not impose a duty of additional inquiry on assignees."

*Id.* ("we cannot agree that awareness of the practices of some creditors can be equated to knowledge that a particular disclosure on a particular TILA form is inaccurate or incomplete.").

Defendant's citation to *Ritter*, another failure-to-remit case, is similarly misplaced.[3] *Ritter* involved a Rule 12 motion to dismiss multiple TILA allegations; the court declined to consider arguments on the first two claims alleged by the plaintiff in that case because it would have been unable to resolve the issue without straying outside the pleadings, but ruled upon the plaintiff's claim that a warranty charge was included as part of the "amount paid to others on your behalf" rather than the "finance charge" despite the fact that the dealer retained a portion of the warranty charge, without disclosure of this fact. *Ritter v. Durand Chevrolet, Inc.*, 932 F. Supp. 32, 34 (D. Mass. 1996). The court ruled that this practice was a TILA violation as to the dealer, but declined to hold the assignee liable pursuant to the "apparent on the face of the documents" carve out, 15 U.S.C. § 1641(a), because the fact that the dealer had retained a portion of the warranty charge (and not disclosed this fact in any documents) was not apparent on the face of the disclosure statement or other documents assigned, *Id.* at 35 ("the mere allegation that BayBank had general knowledge of the dealer's practice is not sufficient to find that BayBank violated **§**1641(a)")

Indeed, in describing the sorts of facially apparent violations that *do* lead to assignee liability under TILA, *Taylor* employed an analogy that could easily be applied to the instant case:

> In effect, the rule for which the plaintiffs are arguing would impose a duty of inquiry on financial institutions that serve as assignees. Yet this is the very kind of duty that the statute precludes, by limiting the required inquiry to defects that can be ascertained from

---

[3]       The third case cited by Defendant on this point, *Miranda*, provides no authority whatsoever: there, the Plaintiff expressly disclaimed seeking statutory damages under TILA, and so the court never even considered the question of whether the violation alleged there was apparent on the face of the documents. *Miranda v. Universal Fin. Grp., Inc.,* 459 F. Supp. 2d 760, 764 (N.D. Ill. 2006). While the precise nature of the violation Miranda alleged is not apparent from the above-reference opinion, a PACER search reveals that she appeared to allege some sort of scheme to pay the originating creditor's loan officer a commission out of the loan proceeds without disclosure of the amount as a "finance charge." Naturally, such a violation would not be apparent on the face of those documents, and has little bearing on the instant case, where the violation arises from the express terms of Plaintiff's RIC.

the face of the documents themselves. A useful analogy is the duty of banks to review documents presented under a letter of credit. Like an assignee bank reviewing a TILA statement, a bank reviewing a letter of credit is responsible for noticing *facial irregularities*, such as statements that are illegal, impossible, *or in conflict with other terms*.

*Taylor* at 694 [emphasis added].

The illustrative violation described by the Seventh Circuit in *Taylor* is exactly the sort that Defendant is alleged by Plaintiff to have committed here. That Plaintiff's interest rate exceeded the program limit for the GAP Protection product that she was charged $895 for, and that that $895 provided Plaintiff absolutely nothing in return, is a facial irregularity that any reasonable assignee creditor should and would detect. The inclusion of the GAP charge as part of the "amount financed" is in conflict with plain terms of Plaintiff's RIC, from which it cannot be denied that the money charged to Plaintiff and disclosed as a fee for debt cancellation coverage was nothing of the sort. Where Defendant's cases involved dealer conduct that rendered TILA disclosures deficient, in this case, it was the very terms of the RIC itself that did so. And obviously, the plain language of a contract is apparent on its face.

    D.    *State Law Claims*

As Defendant acknowledges, the validity of the state law claims depend on the TILA argument (Def.'s Memo at 12). Because the TILA claims survive, so do the state-law MVRISA claims.

**WHEREFORE,** Defendant's motion should be denied in its entirety.

Respectfully Submitted,
/s/ James P. Batson

Christopher V. Langone
James P. Batson
Langone | Batson
150 N. Michigan, #800
Chicago, IL 60602
(312) 291-4613

## CERTIFICATE OF SERVICE

The undersigned, an attorney of record in this case, certifies that on today's date, I caused a copy of the foregoing to be filed via the Court's ECF filing system, whereupon all counsel of record were served.

Dated: January 19, 2016                                    /s/ James P. Batson